## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCHARLETTA MCNEIL, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 18-1750 |
| | : | |
| THE TRUSTEES OF THE UNIVERSITY OF | : | |
| PENNSYLVANIA d/b/a HOSPITAL OF THE | : | |
| UNIVERSITY OF PENNSYLVANIA, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                             **MAY  8, 2019**

Plaintiff Scharletta McNeil ("McNeil") filed this action against Defendant The Trustees of the University of Pennsylvania d/b/a Hospital of the University of Pennsylvania ("Penn"), alleging various claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*

Presently before the Court is Penn's Motion for Summary Judgment.  McNeil has filed a Response in Opposition, and Penn has filed a Reply Brief.  For the reasons that follow, Penn's Motion is granted.

# I.  BACKGROUND

## A.  Factual History

### 1.  McNeil's Positions at Penn and Penn's Employment Policies

McNeil is an African American woman who began working at Penn in approximately November 2014 as a temporary administrative assistant in the Radiology Revenue Cycle Operations Department ("RRCO").  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 7.)  At the recommendation of Heather Kesner ("Kesner"), the Director of the RRCO, Penn hired McNeil as a full-time administrative assistant in March 2015.  (*Id.*; Def.'s Mem. Law Supp. Mot. Summ. J. 3.)  McNeil's job duties included supporting Kesner, answering the phone, sending letters to patients, ordering supplies, and various other administrative duties.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 7-8.)  During this time, McNeil reported to Megan Smith ("Smith"), who was the Clerical Services Supervisor, until March 2017, at which she then reported to Catherine Oliva ("Oliva").  (Def.'s Mem. Law Supp. Mot. Summ. J. 4; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 8.)

In August 2017, Penn determined that the RRCO no longer needed a full-time administrative assistant.  (Def.'s Mem. Law Supp. Mot. Summ. J. 5.)  Instead of terminating McNeil's employment when the position was eliminated, Penn transferred her to be a Patient Service Associate ("PSA") with the Reception Division of the Radiology team.  (*Id.* at 5; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 9.)  Penn transferred McNeil without her having to apply or interview for the position, nor did she lose any salary or benefits.  (Def.'s Mem. Law Supp. Mot. Summ. J. 5.)  Her transfer letter explained that she would be required to complete a 180-day introductory period ("Introductory Period"), a time in which employees are not issued written warnings but, rather, are provided letters explaining the issues an employee is having and how to move forward.  (*Id.* at 8, Ex. B ("McNeil Dep."), Ex. 7; Ex. J ("Carey Dep.") at 109-10.)  Formal

written warnings are not issued during the Introductory Period because the employee is still on probation to determine "whether a successful employment relationship can be established." (McNeil Dep., Ex. 27.) Although Penn employs a "Performance Improvement and Progressive Steps Policy" that governs employee discipline in certain contexts, it does "not apply in taking corrective action or terminating a per diem/PRN employee or an employee in their Introductory Period." (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. O.)

Antoinette Carey ("Carey"), who is an African American woman, supervised McNeil upon the latter's transfer to the PSA position.[1] (*Id.* at 5; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 9.) As part of McNeil's orientation into the PSA position, she reviewed, among other things, Penn's policies regarding Equal Employment Opportunity and Affirmative Action, Professionalism and Standards of Conduct, Performance Improvement and Progressive Steps, the Introductory Period, HIPAA, and "privacy as [it] relates to [the] position and system access." (*See* Def.'s Mem. Law Supp. Mot. Summ. J. 6, Ex. L ("Univ. of Pa. Health Sys. New Employee Dep't Orientation Checklist").) McNeil was also aware that Penn maintained a "Need to Know Determination" policy and a "Uses and Disclosures of [Protected Health Information ("PHI")] for Treatment, Payment, and Healthcare Operations" policy. (*See id.* at 7) (citing McNeil Dep., Ex. 11 ("Need to Know Determination"), Ex. 12 ("Uses & Disclosures of PHI for Treatment, Payment, and Healthcare Operations")). Penn's Need to Know Determination provides that "when accessing, using, disclosing, or requesting PHI, [Hospital of the University of Pennsylvania/Clinical Practices of the University of Pennsylvania] workforce members must make reasonable efforts to limit PHI to the minimum necessary to accomplish the intended purposes of the access, use, disclosure or request." (Need to Know Determination at 1.)

---

[1] Carey supervises three patient service coordinators, one team lead, and nineteen PSAs. (Carey Dep. at 9-16, 32, 47.) Sixteen of the individuals Carey supervises are African American, one is Indian, four are Hispanic, and two are Caucasian. (*See id.* at 11-16, 32, 47.)

Likewise, the Uses and Disclosures of PHI for Treatment, Payment, and Healthcare Operations states that "[PHI] will be used and disclosed in a manner that respects a patient's right to privacy, and in accordance with HIPAA and HITECH privacy regulations and applicable laws." (Uses & Disclosures of PHI for Treatment, Payment, and Healthcare Operations at 1.)

Penn also maintains a "Professional Image Policy" that employees of the Radiology Department must adhere to. (Def.'s Mem. Law Supp. Mot. Summ. J. 7; *see also* Univ. of Pa. Health Sys. New Employee Dep't Orientation Checklist.) The Professional Image Policy prohibits, among other things, extreme hair color, as much of the PSA position is patient-facing. (*Id.*) The dress code for the PSA position was specifically reviewed with McNeil upon her transfer. (*Id.*)

### 2. McNeil's Performance as a PSA

McNeil started her new position as a PSA on September 11, 2017. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 9.) On October 13, 2017, Carey issued to McNeil a performance status letter detailing numerous ways in which McNeil was failing to meet the expectations of a PSA. (McNeil Dep., Ex. 27 at 1.) The letter was designed to "summarize [McNeil and Carey's] discussion of [McNeil's] failure to meet the non-operational expectations of a PSA." (*Id.*) The letter provided the following ways in which McNeil was not meeting the non-operational aspects of a PSA:

- Professionalism and standards of conduct performance expectations

- [I]nteracts with colleagues in a condescending manner

  - Ex. Publicly asking a colleague "why aren't you the Lead" in the presence of the Lead

- Frequent public announcements that challenge the positive work environment

- o Ex. Constantly saying "let me keep my mouth shut, that's why I got in trouble down town"

- Ineffective communications

  - o Ex. [F]ailed to take an appropriate message from a telephone call for the Supervisor, e.g., you informed me that "some man" called for me and was unable to provide me with any information regarding the call

- Failing to seek appropriate clarity when you were unsure of a directive, e.g., removing the hand sanitizer from the desk tops

- Professional appearance

  - o As you are aware, it is critical that we support a professional image at all times. This includes our uniforms and accessories

    - ▪ During a discussion regarding the uniform sweater, you removed it; however, at a later time, you put the sweater back on while you were working

    - ▪ After a discussion we had regarding the inappropriate earrings, you removed them; however, after I departed from the work location, you put them back on while you were still at your desk

(*Id.*) The letter concluded by stating that "[a]ny additional performance deficiencies or your failure to demonstrate a successful level of performance . . . may result in the conclusion of the introductory period and termination of your employment." (*Id.* at 2.) McNeil sent a lengthy email in response in which she admitted much of the conduct. (Def.'s Mem. Law Supp. Mot. Summ. J. 9, Ex. P.)

On approximately December 27, 2017, McNeil again failed to conform to one of Penn's policies. (Def.'s Mem. Law Supp. Mot. Summ. J. 10; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 14.) Wendy Metz ("Metz"), an Associate Director in the RRCO department, observed McNeil with

blue hair, which violated the department's Professional Image Policy. (Def.'s Mem. Law Supp. Mot. Summ. J. 10; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 14.) Metz took a picture of McNeil with the blue hair to confirm with Human Resources and Kesner that the issue should be addressed. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 14, Ex. F ("Metz Dep.") at 98-99.) Kesner confirmed the blue hair violated the Professional Image Policy and told Metz that it needed to be addressed. (Metz Dep. at 98-99.) Kesner directed Metz to "follow the policy, which would be to let [McNeil] know that it was in violation and to send her home and have it corrected before she returned to work." (*Id.* at 101.) Metz prepared an interoffice memorandum and spoke with McNeil about the issue. (*Id.* at 103; Def.'s Mem. Law Supp. Mot. Summ. J., Ex. U ("December 28, 2017 Interoffice Memorandum").) The interoffice memorandum provided, in part:

> As part of your department orientation, on September 19, 2017, the Radiology Professional Image Policy was reviewed with you, and was re-reviewed on additional occasions afterwards. As noted in the Professional Image Policy, extreme hair colors are unacceptable. Reporting to work with blue hair challenges the Professional Image Policy and performance expectations.
>
>        \*       \*       \*
>
> Please know that your operational performance remains acceptable at this time; however, your overall performance continues to be unacceptable at this time.
>
>        \*       \*       \*
>
> As you are aware, during your Introductory Period, if you continue to fail to meet the required expectations of the overall role, you will be notified of not meeting expectations of the positions, which could result in the termination of your employment.

(December 28, 2017 Interoffice Memorandum.)

On January 8, 2018, a Penn employee, Patient H, went to the Radiology Reception at Penn's Perelman Center for a mammogram appointment. (Def.'s Mem. Law Supp. Mot. Summ.

J. 11, Ex. V ("Patient H Dep.") at 17; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 29.) McNeil and Patient H are first cousins. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 29.) When Patient H arrived at the reception area, McNeil called Patient H over to her station out of turn. (McNeil Dep. at 133.) At her deposition, Patient H testified that "[McNeil] said hi, I said hi. I guess she registered me. I don't know what she did, but she asked me was I here for – she said, you're here for your pelvic, something else that I wasn't there for." (Patient H Dep. at 22.) Patient H then completed some paperwork and was called for her appointment. (*Id.* at 24.)

Although Patient H went to Penn on January 8, 2018 for a mammogram appointment, she did have an appointment scheduled later that month for a pelvic exam. (*Id.* at 29.) Patient H testified that her interaction with McNeil was "uncomfortable" because Patient H "came for a mammogram but [McNeil] asked me was I there for my pelvic. I wasn't there for that. I was uncomfortable with that." (*Id.* at 28.) She described the situation as "touchy," as her pelvic exam related to a cancer scare. (*Id.* at 29.) She further testified that she would have a problem if McNeil looked through her medical file because she "wouldn't want [her] family members to know [her] personal business as far as, you know, what's going on with me. I think that's personal." (*Id.* at 32.)

On January 10, 2018, Patient H went and spoke with Andrea Mathis ("Mathis"), an African American woman who is the Human Relations, Employee Relations and Retention Specialist responsible for the Radiology Department at Penn. (Def.'s Mem. Law Supp. Mot. Summ. J. 4, Ex. H ("Mathis Dep.") at 7-9.) Patient H went to Mathis in-person asking for her medical records to be sealed. (Patient H Dep. at 36-38; Mathis Dep. at 96; *see also* Def.'s Mem. Law Supp. Mot. Summ. J., Ex. W ("January 10, 2018 Mathis Email").) Patient H wanted her medical records sealed because she has "family members that work [at Penn] and [she] [felt]

uncomfortable and [she] just wanted [her] records sealed." (Patient H Dep. at 38.) Although she did not specifically express to Mathis that McNeil did anything wrong, she "did tell [Mathis], you know, [McNeil] asked about one thing when I went for something else, so that's why I wanted my records sealed; I did say that." (*Id.*)

Mathis promptly sent an email to her boss, Karen Haugh, and Karen Anderson ("Anderson"), Penn's Privacy Officer, explaining, in part:

> This morning around 11:45 [a.m.], an employee [Patient H] came into HR (Ground Gates) and shared the following:
>
> - She went to Ground Perelman for a mammogram
>
> - While being registered, the Patient Service Associate (PSA), Scharletta [McNeil], stated to her, "you're getting a US vaginal"
>
> - This statement made Patient H uncomfortable and feel that her "personal information was looked at" and "it (the US vaginal) had nothing to do with [Patient H] getting a mammogram"
>
>   o Patient H shared with me that she is having cancer ruled out and felt that her getting a mammogram has nothing to do with getting another type of screening.
>
>                    *       *       *
>
> - Patient H shared that she is not comfortable going there in the future.
>
>                    *       *       *
>
> ***Could I please request an access report and investigation on Scharletta McNeil's access.*** Thank you.

(January 10, 2018 Mathis Email.) Anderson responded, stating that she took screenshots documenting McNeil's access of Patient H's health information and that it appeared "appropriate for her job role." (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. X.) Anderson further wrote that McNeil's "verbal questions about the pelvic US and loud questioning at the desk [was] a

concern," and requested that Mathis follow-up with her regarding Mathis' interview of McNeil. (*Id.*) Regarding Anderson's comment that it appeared McNeil's access of Patient H's health information appeared appropriate for her job role, she determined only that it was appropriate for a PSA to have access to the information McNeil accessed in Patient H's medical record. (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. Y (Anderson Decl.) ¶ 7.) Anderson "did not determine whether it was appropriate for [McNeil] to access the information she accessed in the complaining patient's medical record at the time [McNeil] accessed the information," (*id.* ¶ 8), as that was "an operational question to be determined by someone familiar with the registration process, not [her]," (*id.* ¶ 9).

Mathis asked Kesner to assist in the investigation. (Mathis Dep. at 102-03.) Kesner helped Mathis gain an understanding of the patient registration process and ran an audit to show the amount of time McNeil was in Patient H's medical file and what information was viewed. (Def.'s Mem. Law. Supp. Mot. Summ. J. 14, Ex. AA.) Kesner confirmed, among other things, that: (1) the audit showed McNeil accessed the pelvic exam information on January 4, 2018, which was several days before Patient H's mammogram appointment[2]; (2) there was no need for McNeil to access the pelvic exam appointment because the appointment was already scheduled; (3) McNeil accessed Patient H's pelvic exam appointment for a second time on the day of the mammogram appointment; and (4) Patient H's information was accessed for eight minutes on the date of her mammogram appointment, whereas it takes only two minutes to clear pre-registered appointments. (*Id.*)

On January 11, 2018, Mathis and Kesner met with McNeil to discuss the matter. (Def.'s Mem. Law Supp. Mot. Summ. J. 15; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 31.) McNeil was given a laptop, and Kesner asked her to go through the process that should be followed when a

---

[2] We again note that Patient H's pelvic exam was sometime after her mammogram appointment.

patient arrives at the reception area. (Def.'s Mem. Law Supp. Mot. Summ. J. 15; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 31.) McNeil showed Mathis and Kesner the steps that normally would be followed. McNeil was also asked why she re-registered Patient H, who had been "previously registered days before by another PSA, and she couldn't answer that question." (Mathis Dep. at 105-106.)

After the meeting between McNeil, Mathis, and Kesner, Mathis spoke with Carey for an evaluation of McNeil's performance. (*Id.* at 111.) When asked whether she expressed an opinion regarding whether McNeil should be terminated, Carey testified that, at that "point, I really wanted to end the relationship, if you want to know the truth, so I was onboard for whatever they decided." (Carey Dep. at 111.)

Mathis ultimately concluded that McNeil violated Penn's policies because McNeil accessed parts of Patient H's medical file that she should not have. (*Id.* at 109.) Mathis provided a letter dated January 15, 2018 confirming the results of the investigation, which stated that "the investigation has concluded and could not confirm the allegation of your public disclosure of the patient's scheduled radiology procedures; however, performance deficiencies were confirmed. More specifically, you failed to follow the proper procedures and protocols as it relates to patient registering." (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. BB.) McNeil was provided with a termination letter from Carey bearing the same date, which provided:

> On January 10, 2018, a complaint was filed in Human Resources regarding a patient's experience while checking in on January 8, 2018. Based on the complaint, an investigation began and has since concluded. The investigation confirmed performance deficiencies that challenge the patient registration process and procedures. In addition, the investigation confirmed that you have failed to perform as reasonably expected. We have had previous discussions regarding consistently meeting the standards and expectations of a Patient Service Associate, to no avail.

Based on the above, it has been determined that continued monitoring and evaluation is not beneficial. In response, your employment with the Hospital of the University of Pennsylvania is being terminated effective January 15, 2018 with an ineligible for rehire status.

(McNeil Dep., Ex. 13.)

### 3. McNeil's Complaints of Race Discrimination

At her deposition, McNeil testified that she first complained of race discrimination to Smith and Kesner in March or April 2016. (McNeil Dep. at 24.) She stated that she was being treated differently than her white colleagues, but she could not testify about any specifics and did not remember any other part of the conversation. (*Id.* at 25.) McNeil also testified that she complained of discrimination in late 2016 while at a meeting with Ann Costello ("Costello"), Smith, Kesner, and Metz.[3] (*Id.* at 29-30.) In that meeting, McNeil explained that she felt she was being treated differently than her white colleagues based on her observations of Kesner's and Metz's interactions with white employees compared to their interactions with her. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 18.)

In May 2017, McNeil complained about race discrimination in a meeting with Kesner, Metz, and Oliva. (*Id.*) During that meeting, McNeil was informed about the transitioning of some of her duties and expressed concerns about duties being taken away from her. (*Id.*) She testified at her deposition that she noticed her white colleagues were not being treated in the same manner and asked, "are you treating me differently because I'm black?" (*Id.*) Kesner then ended the meeting. (*Id.*)

---

[3] Costello is the Corporate Director of the University of Pennsylvania Health System Radiology. (Def.'s Mem. Law Supp. Mot. Summ. J. 3, Ex. D ("Costello Dep.") at 7.)

During her time as an administrative assistant, Kesner told McNeil to request permission from her before requesting any money from co-workers for various activities. Kesner wrote in an email to McNeil, stating:

> While I understand your sympathies and desire to help folks, we cannot selective [sic] choose when to do these, and cannot do them with only a limited number of the staff. I realize you have a large heart and want to help everyone, but please understand that because of your role, these campaigns are viewed as a direct reflection of both my personal and professional wishes and sets an undesired precedence and air of preferential treatment. For this reason, I ask that we stick to our history of collecting funds for funeral flowers for immediate family members and staff, weddings, and births, when appropriate, and after we discuss it. I ask that you talk to me before doing any type of funds gathering or discussing/campaigning for things, such as the plans for the holiday events. Even the collection of money for things like lunches, lottery, etc. can be tricky.

(McNeil Dep., Ex. 16.) Nevertheless, McNeil in June 2017 received her first written warning from Oliva for sending an email to staff requesting money for a graduation gift. (McNeil Dep., Ex. 25.) McNeil's email "resulted in the staff reaching out to [Kesner] regarding the request for monetary collections, confusion and frustration." (*Id.*)

McNeil submitted an appeal of the June 2017 discipline. (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. CC.) In her typed appeal, McNeil did not deny that she solicited money for a graduation gift for a colleague, but rather stated that other employees have done similar things without reprimand. (*Id.*) She further stated, "[m]y concern is, is it because I'm black." (*Id.*) Costello conducted a review of the written warning and had discussions with McNeil and Oliva about it. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 20.) McNeil complained to Costello that she felt like she was being targeted because of her race, and Costello responded by stating, "no, no Scharletta, we don't say those type [sic] of things around here." (McNeil Dep. at 40.) On

August 25, 2017, Costello upheld the first written warning.  (Def.'s Mem. Law Supp. Mot. Summ. J. 19.)

On June 27, 2017, McNeil sent an email to Ralph Muller, Chief Executive Officer of the University of Pennsylvania Health System, requesting review of her first written warning.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J., Ex. FF.)  The email is long and contains many complaints about her employment at Penn.  The only reference to her race is when she wrote, "I was told that it was unbelievable that I was hired because I was black."  (*Id.*)  Although McNeil complained about the way she was treated at Penn, she did not attribute it to her race.  (*See id.*)  Muller forwarded the email to Human Resources.  (Def.'s Mem. Law Supp. Mot. Summ. J. 21.)  Mathis spoke with McNeil about the situation, at which the latter spoke about her written warning and the way Metz and Kesner addressed and corrected her performance.  (*Id.*)  Mathis raised the topic of McNeil's comment regarding race, and McNeil stated it was because she believed her work was being scrutinized and the manner in which work was given to her.  (Mathis Dep. at 126-28.)  Mathis did not consider McNeil's complaint to be one of race discrimination.  (*Id.* at 124.)

When McNeil was sent home on December 28, 2017 for having blue hair, she said to Metz that it felt like Metz was targeting her because of her race.  (McNeil Dep. at 34.)  Metz said "whatever," and told McNeil to "just go home and we'll call you in a couple of days."  (*Id.*)  McNeil also claims she complained to Mathis in late December 2017 about this as well.  (*Id.* at 147, 168.)

### 4.    McNeil's Disclosure of Her Mental Health Conditions and Use of FMLA Leave

McNeil has been suffering from anxiety and depression since the spring of 2017.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 24.)  At her deposition, she testified she let Kesner know in

May 2017 about her health conditions, and she informed Costello, Mathis, and Carey about them in summer 2017.  (*Id.* at 130-31, 176-77.)  The only manner in which McNeil testified that she thought Penn discriminated against her based on her health conditions was that "[t]hey would say things to me of me being emotional and of me being paranoid.  They knew I had anxiety, and depression, and stress disorder. . . . it seemed to me they were using words that they had not used before.  Other than that, that was it."  (McNeil Dep. at 129-30.)

McNeil took approved FMLA leave in March, July, and August 2017, and intermittently throughout the fall of 2017.  (Def.'s Mem. Law Supp. Mot. Summ. J. 22.)  On January 3, 2018, she again requested FMLA leave.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 26.)

### B.    Procedural History

McNeil filed a four-count Complaint in this Court following her fulfillment of all jurisdictional prerequisites.  The Complaint contains the following counts: race discrimination and retaliation in violation of 42 U.S.C. § 1981 (Count I); race discrimination and retaliation in violation of Title VII (Count II); disability discrimination and retaliation in violation of the ADA (Count III); and interference and retaliation in violation of the FMLA (Count IV).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'"  *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial."  *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992).  "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion.  *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996).  If the court determines there are no genuine disputes of material fact, then summary judgment will be granted.  *Celotex*, 477 U.S. at 322.

## III.  DISCUSSION

### A.  Section 1981 and Title VII (Race Discrimination and Retaliation), the ADA (Discrimination and Retaliation), and the FMLA (Retaliation)

McNeil's various claims of discrimination and retaliation are all subject to the familiar *McDonnell Douglas* burden-shifting analysis.  First, the plaintiff must establish a prima facie case.  *See Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1997) (citation omitted).  If the plaintiff establishes a prima facie case, the burden then shifts to the employer to show that the adverse employment action was taken for a legitimate, nondiscriminatory reason.  *See id.*  "The burden

then falls upon the plaintiff to prove that the 'employer's proffered reason [for the employment action] was not the true reason for the . . . decision' but was instead pretextual." *Id.* (alteration in original) (ellipses in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993)).

Penn presents strong arguments that McNeil fails to satisfy her prima facie case of her discrimination claims under § 1981, Title VII, and the ADA, and her retaliation claims under § 1981, Title VII, the ADA, and the FMLA. However, after careful review of the record in this matter, the Court concludes that Penn has offered a legitimate, nondiscriminatory reason for McNeil's termination—her violation of patient privacy and other performance concerns—and that McNeil cannot show Penn's reason is pretextual. The Court will therefore assume, without deciding, that McNeil has satisfied her prima facie case on all claims subject to *McDonnell Douglas*, and will limit its analysis as to McNeil's arguments regarding pretext.

In a discrimination claim, once the employer has come forward with a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Under the first prong of the *Fuentes* analysis, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 764). Under the second *Fuentes* prong, the plaintiff "must identify evidence in the summary judgment record

that 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 762). Similarly, the pretext step in a retaliation case requires the plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

McNeil provides a lengthy list of ways in which she argues the evidence in this case shows pretext. Only three of her arguments relate to her termination: (1) alleged inconsistencies regarding who made the decision to termination her employment; (2) alleged inconsistent reasons for her termination; and (3) alleged factual disputes regarding her interaction with Patient H. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 51-56.) As discussed below, the Court concludes that none of her arguments would allow a factfinder to believe that Penn's legitimate, nondiscriminatory reason for her termination is pretextual.

McNeil argues that the record contains inconsistencies regarding who made the decision to terminate her employment. She points to Penn's written discovery, which provides that "Andrea Mathis and Antoinette Carey participated in some way in the decision to terminate Plaintiff's employment with Defendant." (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 53, Ex. NN at 3.) When Carey was asked at her deposition about who made the decision to fire McNeil, Carey testified that it was Mathis. (Carey Dep. at 107.) When Mathis was asked the same question during her deposition, she stated that "[Antoinette] Carey decided to end the introductory period. We talked about it, we collaborated." (Mathis Dep. at 87.) During Costello's deposition, she testified that Mathis spoke to her about what should happen regarding McNeil's employment, and they came to a consensus that McNeil should be terminated. (Costello Dep. at 86-87.)

McNeil argues that these alleged inconsistencies are "Defendant's effort to cover up the real decision-makers." (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 54.)

We see no effort on the part of Penn to cover-up the decisionmakers regarding McNeil's termination. The fact that Carey said Mathis made the decision to end McNeil's employment, and Mathis said the opposite, in no way undermines Penn's written discovery response that both participated in the decision. Mathis conducted an investigation into whether McNeil violated patient privacy and asked Carey what her thoughts were about ending McNeil's employment, to which Carey replied that at that "point, [she] really wanted to end the relationship." (Carey Dep. at 111.) While Mathis may have had a discussion with Costello regarding McNeil's employment, it does nothing to suggest that Penn was attempting to conceal who the real decisionmakers were.

McNeil also argues there is evidence of pretext because Penn has set forth inconsistent reasons for her termination. In her deposition, she testified Mathis told her that the only reason she was terminated was for violating Patient H's chart. (McNeil Dep. at 181.) Mathis' testimony on this issue is slightly ambiguous. She first stated that she did not consider McNeil's disciplinary history or any performance reviews in making the decision to terminate her employment. (Mathis Dep. at 91.) But when asked whether she reviewed any documents in determining whether McNeil should be terminated, she testified that "[Carey] and I went through the performance history as a PSA since [McNeil] joined their team, the issues that she was having, the discussion [Carey] had with her." (*Id.*) Costello testified that she and Mathis "would have considered everything," including prior discussions with McNeil and documentation about her performance in her new role as a PSA. (Costello Dep. at 103.)

We see no genuine dispute of material fact that would preclude summary judgment in favor of Penn. After outlining that an investigation took place that confirmed a violation of patient privacy, McNeil's termination letter provides that "[she and Carey] have had previous discussions regarding consistently meeting the standards and expectations of a Patient Service Associate, to no avail." (McNeil Dep., Ex. 13.) As outlined in the termination letter, McNeil's prior performance deficiencies and the Patient H incident were clearly contemplated when Mathis and Carey made the decision to end McNeil's employment. More importantly, McNeil's argument about inconsistent reasons for her termination, like her argument about inconsistencies about who made the decision to terminate her, in no way undermines Penn's legitimate reason for her termination: that a patient complained to Mathis asking for her records to be sealed, and an ensuing investigation that confirmed McNeil accessed parts of the patient's chart without having any reason to do so. McNeil also fails to address anything wrong with the issuance of Carey's October 2017 letter to her. Therefore, McNeil's pretext argument about there being inconsistent reasons for her termination fails.

McNeil also claims there are factual disputes about her interaction with Patient H that preclude summary judgment. In particular, she claims in her brief, without any citation to the record, that Mathis testified that Patient H made a "complaint" about her, but then points to Patient H's deposition testimony disclaiming that Patient H made a "complaint." (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 55.) Ironically, it was McNeil's counsel who characterized Patient H's interaction with McNeil as a "complaint." (*See* Mathis Dep. 94) ("Q: To whom did [Patient H] make the complaint? A: To me."). McNeil further points to the fact that Patient H never told Mathis that McNeil had gone into her medical records, (Patient H Dep. at 45), whereas Mathis testified to the contrary, (Mathis Dep. at 95-96).

McNeil's argument about Patient H's interaction with McNeil and Mathis does nothing to preclude summary judgment in favor of Penn. First, regardless of whether the interaction is labeled a "complaint," the fact remains that Patient H went to Human Resources because she wanted her records sealed, as she did not "want [her] family members to know [her] personal business as far as, you know, what's going on with me." (Patient H Dep. at 32.) Indeed, Patient H specifically testified that she felt uncomfortable and told Mathis that "[McNeil] asked about one thing when [she] went for something else, so that's why [she] wanted [her] records sealed." (*Id.* at 38.)

Moreover, regardless of whether Patient H told Mathis that McNeil had gone into her medical records, it remains undisputed that Patient H's conversation with Mathis prompted an investigation into McNeil's patient access, which confirmed McNeil had accessed parts of Patient H's medical records with no reason to do so. Significantly, none of McNeil's pretext arguments concern the investigation into her access of Patient H's medical records. She simply cannot dispute that the investigation confirmed she inappropriately accessed medical information related to a different appointment from that which Patient H presented on January 8, 2018. Accordingly, she cannot show that Penn's legitimate, nondiscriminatory reason for her termination is pretextual, and summary judgment in favor of Penn is warranted on all of her discrimination and retaliation claims.

### B. FMLA Interference

Penn also moves for summary judgment on McNeil's FMLA interference claim. A plaintiff must establish the following elements to make a claim of FMLA interference:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave;

and (5) the plaintiff was denied benefits to which he or she was
entitled under the FMLA.

*Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (quoting *Ross v. Gilhuly*, 755

F.3d 185, 191-92 (3d Cir. 2014)). Penn argues that summary judgment is warranted on McNeil's

FMLA interference claim because it is merely a restatement of her FMLA retaliation claim.

(Def.'s Mem. Law. Supp. Mot. Summ. J. 48.) Additionally, Penn argues that summary judgment

is appropriate because McNeil would have been terminated regardless of her request for FMLA

leave. (*Id.* at 48-49.) McNeil's opposition brief, which spans seventy-one pages, provides

absolutely no response in opposition. Nevertheless, we agree with Penn and grant it summary

judgment on McNeil's FMLA interference claim.

     The basis of McNeil's FMLA interference and retaliation claims rests on her request for

FMLA leave on January 3, 2018, and her termination on January 15, 2018. (*See* Compl. ¶ 36.)

However, courts have held that dismissal of an interference claim is appropriate when the same

facts provide the premise for a retaliation claim. *See Beese v. Meridian Health Sys. Inc.*, No. 11-

7505, 2014 WL 3519124, at *9 (D.N.J. July 16, 2014) ("Moreover, appellate courts have

affirmed dismissal of an FMLA interference claim where it is based on the same facts, and thus

duplicative of, a separately asserted FMLA retaliation claim."); *Yamamoto v. Panasonic Corp. of

N. Am.*, No. 12-2352, 2013 WL 3356214, at *11 (D.N.J. July 2, 2013) ("[T]he interference and

retaliation claims at issue here are redundant. Indeed, the premise of both claims is that

Defendant wrongfully terminated Plaintiff when she returned from FMLA leave. As Plaintiff's

retaliation and interference claims are duplicative, it is appropriate to dismiss the latter.") (citing

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 n.25 (3d Cir. 2012)); *Atchison v.

Sears*, 666 F. Supp. 2d 477, 489 (E.D. Pa. 2009) ("Atchison's interference claim is identical to

his retaliation claim, and premised on the same allegation that Sears took adverse employment

action against him because he requested FMLA leave.").  Because McNeil's interference claim is nothing more than a restatement of her retaliation claim, we grant Penn summary judgment on the former.[4]

Penn is also entitled to summary judgment on McNeil's interference claim because she would have been terminated regardless of her request for FMLA leave.  *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) (adopting the view of other Courts of Appeals and concluding that "the right to commence FMLA leave is not absolute, and that an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave").  The undisputed evidence shows that Penn would have terminated McNeil's employment regardless of her January 3, 2018 request for FMLA leave, as the investigation into her access of Patient H's medical information confirmed she violated the patient registration process.  Accordingly, Penn is entitled to summary judgment on her FMLA interference claim.[5]

IV.     **CONCLUSION**

For the reasons set forth above, Penn's Motion for Summary Judgment is granted.[6]

An appropriate Order follows.

---

[4] McNeil also testified at her deposition that she was not denied any FMLA to which she was entitled.  (McNeil Dep. at 116.)

[5] Penn also moves for summary judgment on a claim of hostile work environment.  While McNeil's briefing provides vague references to a hostile work environment, her Complaint does not contain such a cause of action, and she provides absolutely no response to Penn's argument.  Accordingly, to the extent McNeil is pursuing a claim of hostile work environment, summary judgment is also granted to Penn.

[6] Penn requests oral argument on its Motion for Summary Judgment.  The Court denies its request, as the Motion can be adjudicated based on the fully developed factual record.